[No. 28625. Department One. May 11, 1942.]

MAURICE R. BELCHER, *Appellant*, v. LENTZ HARDWARE COMPANY, *Respondent*.[1]

*J. P. Tonkoff* and *I. J. Bounds,* for appellant.

*LaBerge & Lyon,* for respondent.

MILLARD, J.—Plaintiff was seriously burned March, 1940, while using on his own premises a "Super-flame" gasoline operated weed burner purchased by a school district in Yakima county September, 1939, from defendant corporation, a retail hardware dealer. On the

[1]Reported in 125 P. (2d) 648.

theory that the proximate cause of his injury was the defective construction of the weed burner, of which defective condition defendant had knowledge or notice, and that plaintiff relied upon defendant's misrepresentation that the weed burner was safe, sound to use, and well suited for the purpose for which it was sold, plaintiff instituted this action to recover against defendant for personal injury he sustained. The cause was tried to the court sitting with a jury. Defendant's challenge, at the close of plaintiff's case, to the sufficiency of the evidence and defendant's motion for a directed verdict, at the close of plaintiff's case, were denied. Defendant's motion for judgment notwithstanding the disagreement of the jury was granted. Plaintiff's motion for new trial was overruled. Plaintiff appealed.

Counsel for appellant contend that an instrumentality, such as a weed burner which uses gasoline under pressure for fuel, is in itself imminently and inherently dangerous unless properly constructed; that the weed burner was purchased upon specific representations and warranties of respondent (who had knowledge or notice that the weed burner was improperly, defectively, and dangerously constructed) that the weed burner was a safe instrument to be used for the purpose for which it was intended; and that, by reason of defective construction of the weed burner, appellant sustained injuries to recover for which this action was instituted.

A negative answer to the question whether there is evidence or reasonable inference from evidence to sustain a verdict that defective construction of the weed burner was a proximate cause of the accident, is determinative of this appeal. The facts, briefly, are as follows:

Appellant, principal of a public school in Yakima county, accompanied by a janitor of the same school, called at respondent's store in the fall of 1939 and purchased for the school district employing him a "Superflame" weed burner. Respondent had been selling the burners, which it purchased from the manufacturer thereof in Colorado, about three years. One of respondent's clerks explained to appellant, who stated he was without experience in the use of such instrument, how to operate the burner and informed appellant that the weed burner was a safe and easy machine or instrument to operate, and fit in every way for the purpose for which it was being sold.

Appellant and the janitor took one of the weed burners with them to the school where they were employed, but returned it to respondent's store a few days later, with the explanation that they had difficulty in fastening the top. A clerk employed by respondent instructed appellant and the janitor how to fasten the top. Those two gentlemen, who were satisfied by that instruction, again took the weed burner with them to their school and used it in burning weeds in the school yard. As the weeds were too wet, these gentlemen stored the burner, which still contained gasoline in its tank, in the furnace room at the school house, where it remained during the winter. It was later used by the janitor and two or three boys in burning weeds at the janitor's home.

March 3, 1940, six months subsequent to its purchase by the school district, the burner was taken from the school house by appellant, who purchased some gasoline to operate the burner, and used about an hour by appellant and his brother in burning weeds on appellant's land. While appellant's brother was using the burner, the jet became clogged. Appellant took the jet

apart and cleaned it. He then relighted the burner. About this time a neighbor halted at appellant's land, whereupon the three—appellant, his brother, and the neighbor—squatted on the ground and chatted for a few minutes. During this period of neighborly conversation, the tank (which contained gasoline) of the weed burner was resting on the ground, and appellant was holding the hose and pipe attachment in front of him with the flame several inches above the ground. Appellant noticed that the hose had slipped about one-half inch along the nipple and that gasoline bubbles were forming. Almost coincident in time with his request to his brother to get a pair of pliers, the hose came off the nipple, appellant was sprayed with gasoline escaping through the hose, and the gasoline ignited with resultant serious burning of appellant.

Appellant testified that he operated the weed burner, as instructed by respondent, by pumping air into the gasoline tank (on which there was no gauge or anything else to indicate the amount of pressure in the tank) to create pressure which forced the gas through the pipe and hose on the burner. After appellant had produced what he deemed was sufficient pressure on the gas, he warmed the burner and then opened a stop valve to permit the gasoline to flow from the chamber into the burner. The hose connecting the burner with the gas tank came off the pipe, causing the gasoline to spray appellant, and the flame from the burner came into contact with appellant and ignited the gasoline.

The only conversation, other than respondent's representation that the weed burner was safe and well suited for the purpose for which the school district purchased it, had by appellant and respondent's clerks was with reference to the top of the weed burner and not to any other part of the machine. Appellant did

not at any time examine the connection where the hose was put over the nipple, nor the crimp clamp which had been installed at the factory. The first time appellant noticed the hose was loose was immediately prior to the time it came off the nipple and he was sprayed with gasoline. Appellant and the janitor testified that, after they were shown by one of the respondent's clerks how to fasten the cap on the top of the tank, they had no further trouble as to that.

It is appellant's position that the burner was defectively constructed in that it had no gauge or anything on the tank to indicate the air pressure; that the weed burner lacked a clamp or other device to hold the hose on the pipe; and that the pressure from the tank through the feed to the burner caused the hose to become detached from the pipe and permitted the gasoline to be sprayed with considerable force upon appellant.

Appellant, according to his own testimony, did not pump air into the tank to the extent that he felt there was excess pressure during any of the time appellant was using the weed burner. There is no evidence that the absence of a pressure gauge was in any way a contributing cause of the accident, and there is no testimony, except that of appellant's expert witnesses, as to the cause of the separation of the hose from the nipple, which testimony is not to the effect that the burner was defectively constructed and that such defective construction was a proximate cause of the accident.

One of respondent's clerks testified—his testimony is not out of harmony with the testimony of appellant and the school janitor—that he explained to appellant and the janitor the method of fastening the cap on to the tank. He then instructed those two men that the weed burner was put into operation by placing gaso-

line into the tank, pumping pressure into the tank with the pump which was attached thereto, then turning the valve and forcing gas into the burner. The gasoline is lighted for the purpose of generating the burner and, after the burner is generated, the gas is turned on and the machine is used like a blow torch.

Appellant called three witnesses who, testifying as experts, stated that a hose connection fitting over a smooth iron pipe with a clamp, such as was used on the weed burner in the case at bar, is unsafe, taking into consideration the fact that gas under pressure is passing through the pipe and hose; and that the hose and pipe connection should be held together with a clamp which is adjustable, similar to the clamp used to connect the hose to the tank, as a crimp clamp cannot be tightened when it becomes loose except at the factory. The experts further testified that pressure exerted on the tank would cause the joints to loosen and the tank should therefore have some kind of gauge or device to indicate the pressure. None of the three experts testified that the absence of a pressure gauge caused, or that the presence of such device would have averted, the accident. Neither of the experts testified that the kind of clamp used caused the accident, or that, if the manufacturer had used a different kind of clamp than the one which was employed, the accident might not have happened. No one of appellant's three experts testified that the weed burner was defectively constructed, and that such defective construction was a proximate cause of the accident.

The experts testified that there may have been a number of causes for the accident. One testified that the connection of the hose to the feed line was not a safe connection as there was no adjustment so that the connection could be tightened in case it leaked; that,

if too much pressure were exerted, there would be a loosening of some joint or an explosion. He further testified that he did not know whether the clamp was put on under pressure, nor could he state the amount of pressure one could put into the tank by hand exertion. This expert is a machinist whose experience was limited to gasoline trucks and the like; he had never tested the pressure in a gasoline blow torch.

The second expert testified that the question whether the connection between the hose and the metal pipe was safe was dependent upon the

". . . question of how tight the ferrule is. Without trying it I wouldn't say it would slip off with any degree of tightness on these. If the ferrule or clamp was tight enough it might stay. When the machine was sold, in a new condition, off hand, I would say it was safe. I wouldn't be able to say definitely it would stay in that condition."

He also testified that, if the weed burner had been used, then kept in a furnace room—as the one in the case at bar was—for a period of six months, it might have an effect upon it.

"In considering what caused the hose to come off the pipe there are many elements to be considered. If the machine had been used and stress and strain placed upon this crimp clamp and it had been loosened, that would have an effect upon it. . . . It depends upon what happened to it after it came out of the factory. Without knowing the facts it is impossible for anyone to tell what happened in this particular instance."

The third expert testified that he had observed the clamp used connecting the hose to the metal pipe; that

"It is a pressed, fitted ferrule clamp. Once it is put on, there isn't any way to tighten it except by machine. Whether that would be safe would depend entirely upon the pressure put upon it."

There is no evidence that, when it was sold by respondent to appellant's employer six months prior to the date of the accident, the weed burner was unsafe or that the crimp clamp was not tight enough to hold the hose on the pipe. There is no evidence of excessive pressure. Appellant testified that he did not pump air into the tank to the extent that he felt there was excessive pressure at any time. There is not any evidence that the absence of a device to measure the pressure was a contributing cause of the accident. There is evidence—testimony of appellant's expert witnesses—that, when the machine, while new, was sold to the school district, the machine was safe and that the subsequent use of the machine and storage for six months in furnace room of the school building "might have an effect upon it." One expert testified that

"In considering what caused the hose to come off the pipe there are many elements to be considered. . . . It depends upon what happened to it after it came out of the factory. Without knowing the facts it is impossible for anyone to tell what happened in this particular instance."

Appellant proved no more than that he conformed to the practice of others in performance of the same act; that is, the correct method of producing pressure to force the gasoline through the pipe and hose on to the burner, was employed by appellant. There is no showing that such method ever caused the hose to become detached from the pipe. The hose connecting the burner to the gas tank was fastened in the same manner and by same means as were other burners of the same kind, and there is not a scintilla of evidence that pressure in the tank ever caused the hose to become detached from any burner.

Was the hose forced off the pipe by deterioration of the cement caused by retention of gasoline in the tank

for a period of six months? Was the hose forced off the pipe by excessive pressure—was the pressure excessive—during the time machine was in use? Was the hose forced off the pipe by exterior force when appellant was adjusting the nipple? Was it forced off by too close proximity to the burning weeds? Was it forced off or loosened by school children during the time it was stored in the furnace room of the school building? It is well to reiterate the pertinent testimony of one of appellant's witnesses that

"It depends upon what happened to it after it came out of the factory. Without knowing the facts it is impossible for any one to tell what happened in this particular instance."

Appellant's case is dependent upon the testimony of his three expert witnesses, none of whom testified that the accident occurred as a result of defective construction of the weed burner. Their testimony, viewed in the light most favorable to appellant, is to the effect that whether the connection was safe is dependent upon whether the clamp was sufficiently tight, and whether the clamp was sufficiently tight would be determined entirely by the amount of pressure pumped into the tank. That is, if there were excessive pressure from the tank, it *could* have caused the hose to separate from the pipe if the clamp were not sufficiently tight; the hose came off the pipe; therefore, the clamp must not have been sufficiently tight. The following language, from the opinion in *Prentice, Etc. Co. v. United Pac. Ins. Co.*, 5 Wn. (2d) 144, 106 P. (2d) 314, is apt:

"This, however, is but reasoning in a circle. It assumes a fact necessary to establish a cause of action, but concerning which assumed fact there is no evidence, and then employs the supposititious fact as the basis for a conjecture as to the possible cause of a particular physical result."

In *Reusch v. Ford Motor Co.*, 196 Wash. 213, 82 P. (2d) 556, the manufacturer was held not liable because of plaintiff's failure to prove that the alleged defect— leakage of gasoline near the muffler or exhaust pipe of an automobile—was the cause of the fire. In the course of our opinion, we said:

"That an appliance, or several appliances of the same design, which employs in its operation gasoline, oil, or other fluid substance, occasionally leaks, does not prove that either the design, material, or construction is defective. The evidence shows that the clamped slip-joint was in general use, and it does not appear that this method of joining the pipe leading from the muffler and the exhaust, or tail-pipe, resulted in danger, or even difficulty, in the operation of motor vehicles. There can be no doubt but that, at the time of the fire, the truck was subjected to very severe strain. There is no direct evidence as to where the spark which ignited the gasoline came from. A finding that the fire was occasioned by a spark from some defective portion of the machinery used in operating the truck, which condition resulted from the negligence of respondent, would be based merely upon speculation and conjecture."

We have examined *State v. Consolidated Gas Co.*, 146 Md. 390, 126 Atl. 105, 42 A. L. R. 1237; *Pitman v. Lynn Gas & Elec. Co.*, 241 Mass. 322, 135 N. E. 223; Restatement of the Law of Torts, §§ 388 to 399, inclusive; annotations 41 A. L. R. 8 *et seq.*; annotations 111 A. L. R. 1239 *et seq.*; and other opinions and texts on the subject of liability of a dealer in gas heaters and similar chattels for injury to third persons from defects in such articles sold by the dealer. It is unnecessary to review the authorities or discuss other questions raised or suggested, as there was no substantial evidence or reasonable inference from evidence to support a verdict in favor of appellant. There was no question of fact to submit to a jury; therefore, even if the jury

had found for the appellant, the trial court would have granted, or, on appeal of the present respondent, we would have remanded the cause with direction to the trial court to grant, motion for judgment notwithstanding the verdict.

The judgment is affirmed.

ROBINSON, C. J., MAIN, STEINERT, and DRIVER, JJ., concur.