**E. Barbara UPPGREN et al.**

v.

**EXECUTIVE AVIATION SERVICES, INC., a Maryland corporation; Loving Chevrolet, Inc., a Maryland corporation; and Hughes Tool Company (Aircraft Division), a Texas corporation.**

**Civ. A. No. 70-155-M.**

United States District Court,
D. Maryland.

May 10, 1971.

See also, D.C., 304 F.Supp. 165.

Donald E. Sharpe, Baltimore, Md., and Kenneth Walls Parkinson, Washington, D. C., for plaintiffs.

William H. Clarke, Rockville, Md., for defendant, Loving Chevrolet, Inc.

Hal C. B. Clagett and Sasscer, Clagett, Powers & Channing, Upper Marlboro, Md., for defendant, Hughes Tool Company.

JAMES R. MILLER, Jr., District Judge.

## I.

The plaintiff trustee, a Minnesota resident, on her own behalf as the surviving spouse of Robert A. Uppgren and on behalf of their four minor children, to recover damages for the wrongful death of her husband, has instituted this action against the defendants, Executive Aviation Services, Inc. (Executive) and Loving Chevrolet, Inc. (Loving), both Maryland corporations, and Hughes Tool Company (Hughes), a Texas corporation.

Decedent, Robert A. Uppgren, was employed by the United States Govern-ment, Department of the Interior (Interior), in Minneapolis, Minnesota, as a wildlife biologist. On May 12, 1967, in the course of his employment, Mr. Uppgren was a passenger in an Interior helicopter piloted by another Interior employee, when it crashed near Walker, Minnesota, resulting in the death of both Interior employees.

The helicopter involved in the fatality was manufactured by Hughes and pur-chased by Interior from Loving, Hughes' dealer, in 1965. It was delivered to In-terior at the College Park Airport, Col-lege Park, Maryland. On or about April 3, 1967, at College Park, Maryland, Lov-ing and Executive procured and installed a replacement engine in the helicopter. Shortly afterward the helicopter was flown to Minnesota for Interior where the fatal crash occurred.

The Amended Complaint [1] alleges breach of warranties and negligence against each defendant as a result of their failure to equip the helicopter with a "fixed lower pulley coupling bumper plug," an omission which is alleged as the proximate cause of the May 12 fatal-ity. (This omission is alleged to have occurred on the April 3, 1967 repair-date at College Park, Maryland).

From the facts presented it appears that Interior purchased the helicopter from Loving by means of a bid, said bid having been accepted by Interior at Washington, D. C., and notice of such ac-ceptance having been mailed by Interior in Washington, D. C., to Loving at its College Park, Maryland address. A copy of the original contract between the par-ties has not been presented to the court for consideration by it in connection with the pending motion.

Loving has filed a Motion to Strike and/or Reduce Ad Damnum (in which

[1]. Suit was initially instituted in the United States District Court for the District of Minnesota, Fourth Division, against the defendants, Hughes Tool Company, Ex-ecutive Aviation Services, Inc., and Lov-ing Chevrolet, Inc. Executive failed to answer or otherwise appear in the pro-ceedings. The action against the defend-ant Loving was dismissed by order of court dated September 26, 1969 because Loving was not subject to suit in the State or District of Minnesota. The action was transferred to this district on February 9, 1970, and an Amended Complaint has been filed renaming Lov-ing as a defendant.

Hughes joins), pursuant to Rule 12(f) F.R.Civ.P., on the theory that Minnesota law applies and, therefore, it should receive the benefit of the Minnesota statute [2] limiting the amount of recovery in wrongful death actions to a sum not to exceed $35,000. Loving claims that all amounts in plaintiff's petition in excess of this figure should be stricken or reduced as "immaterial and impertinent."

Loving (with Hughes) has also moved to strike paragraph 10 of the Amended Complaint which alleges that the death of Robert A. Uppgren was proximately caused by the wrongful acts of Hughes and Loving, jointly and severally, by breaking an implied warranty of fitness and quality in the sale of the helicopter by defendants to Interior because no "privity" has been alleged between plaintiff's decedent, Uppgren, and Loving. Loving claims that Maryland law is applicable to the warranty phase of the case, and that Maryland requires "privity" when a plaintiff seeks to recover on a warranty arising, as this one does, prior to July 1, 1969.[3]

Jurisdiction in this matter is based upon diversity of citizenship and the amount claimed exceeds $10,000, exclusive of costs and interest.

## II

 In an action founded on diversity of citizenship jurisdiction, this court is bound to follow the choice of law rules of Maryland. Where the highest Maryland court has not established an applicable rule, this court must apply a rule which it reasonably believes would be adopted by the highest Maryland court were it to rule on the question. Debbis v. Hertz Corp., 269 F.Supp. 671 (D.Md.1967); La Chance v. Service Trucking Co., 215 F.Supp. 162 at 164 (D.Md.1963). The general choice of law rule for tort actions instituted in the courts of Maryland is the doctrine of *lex loci delicti,* that the substantive rights of the parties are to be determined by the law of the state in which the alleged tort took place. Dersookian v. Helmick, 256 Md. 627, 261 A.2d 472 (1970); Brady v. State Farm Mutual Automobile Insur. Co., 254 Md. 598, 255 A.2d 427 (1969); Hutzell v. Boyer, 252 Md. 227, 249 A.2d 449 (1969); White v. King, 244 Md. 348, 223 A.2d 763 (1966); Debbis v. Hertz Corp., *supra;* Huber v. Baltimore & Ohio R. R. Co., 241 F.Supp. 646 (D.Md.1965).

The general rule for the choice of law under the doctrine of *lex loci delicti* where the place of the injury is different from the place where the allegedly negligent or wrongful act or omission took place is set out in Annotation, 77 A.L.R.2d 1266 (1961), at 1273, as follows:

"Where the issue is the choice between the law of the place where an

2. Chapter 573.02, Minnesota Statutes Annotated, Vol. 37, 1967 *edition:*

"573.02 Action for death or injury by wrongful act

"Subdivision 1. When death is caused by the wrongful act or omission of any person or corporation, the trustee appointed as provided in subdivision 3 may *maintain an action therefore if the decedent might have maintained an* action, had he lived, for an injury caused by such wrongful act or omission. The action may be commenced within three years after the act or omission. *The recovery in such action is such an amount as the jury deems fair and just in reference to the pecuniary loss resulting from such death, shall not exceed $35,000* and shall be for the exclusive benefit of the surviv-

ing spouse and next of kin, proportionate to the pecuniary loss severally suffered by the death * * *." (Emphasis supplied).

3. Blankenship v. Morrison Machine Co., 255 Md. 241, 257 A.2d 430 (1969), held* that the doctrine of privity of contract still applies in Maryland in respect to cases involving personal injury based on manufacturer's warranties in which the contract of sale by the manufacturer predated the July 1, 1969 effective date of the amendment to the Maryland Annotated Code, Article 95B, § 2–318. That amendment has virtually eliminated the viability of the defense of lack of privity in personal injury claims such as this one based on manufacturers' warranties in Maryland.

allegedly wrongful act or omission took place and the law of the place where physical injury or death or both were inflicted, the general rule is that the place of the tort, within the contemplation of the rule that *the law of the place of the tort* or wrong governs liability and other substantive matters, is *the place where the injury or death was inflicted* and *not the place where the allegedly wrongful act or omission took place.*"

This rule has been applied as expressing Maryland law in Debbis v. Hertz Corp., *supra.*

■ In the present case, the place where the physical injury or death occurred and, therefore, the place of the tort would clearly be Minnesota, the site of the helicopter crash. Applying the rule of *lex loci delicti*, it would appear incumbent upon this court to apply the substantive tort law of Minnesota and, thus, the monetary limitation on recoveries which the Minnesota Legislature has seen fit to enact. However, plaintiff asserts to do so would be repugnant to the public policy of Maryland as promulgated by its legislature through the Wrongful Death Act found in Article 67, § 1 et seq., Annotated Code of Maryland (1970 Replacement Volume).

■ Section 2 of said Act provides:
"§ 2. When wrongful act occurs outside of Maryland—In general.

"In any action instituted in the courts of this State where it shall appear that the death of a person has been caused by the wrongful act, neglect or default of a vessel or of another person, firm or corporation, and such wrongful act, neglect, or default shall have occurred outside of the State of Maryland, whether in another state, the District of Columbia or territory of the United States, to the facts of the particular case, as though such foreign law were the law of this State, provided, however, that the rules of pleading and procedure effective in the courts of this State in which the action is pending govern and be so applied as to give effect to the rights and obligations created by and existing under the laws of the foreign jurisdiction in which the wrongful act, neglect or default occurred; provided, however, that nothing in this section shall apply to causes of action arising prior to June 1, 1937."

Nowhere within the language of this section, nor the other sections of the Act, has the legislature imposed a monetary limitation on recoveries under the statute. Judge Thomsen of this court had occasion to quote with approval, in La Chance v. Service Trucking Co., *supra*, pertinent statements of law as follows:

"In Loucks v. Standard Oil Co., 224 N.Y. 99, 120 N.E. 198, 201, Judge Cardozo said: 'Similarity of legislation has indeed this importance; its presence shows beyond question that the foreign statute does not offend local policy. *But its absence does not prove the contrary.*' Judge Goodrich, in his work on Conflict of Laws, 3d ed., sec. 11, says: 'It should take an extraordinary case to justify an argument founded upon the public policy of the forum.'" 215 F.Supp. at 164 (Emphasis supplied).

The mere absence, therefore, of a monetary limitation upon recovery under the Maryland Wrongful Death Act does not of itself reflect such a strong public policy of Maryland as to prevent enforcement of the Minnesota Wrongful Death Statute's monetary limitation. In a proper case, however, it is true that comity between the states does not require the Maryland courts to enforce a law of a sister state when such action would violate the public policy of Maryland. Henderson v. Henderson, 199 Md. 449, 87 A.2d 403 (1952).[4] The question then remains as to what the public poli-

4. But this rule is subject to exceptions. See 28 U.S.C. § 1738; Hughes v. Fetter,

341 U.S. 609, 71 S.Ct. 980, 95 L.Ed. 1212 (1951).

cy of Maryland is on the question of monetary limitations on recovery for wrongful death.

In recent years the Maryland General Assembly has removed certain artificial barriers to recovery for wrongful death.[5] On the other hand, Judge Kaufman of this court ruled in Debbis v. Hertz Corp., *supra*, 269 F. Supp. at 679, in 1967 that a recovery ceiling imposed by the wrongful death statute of a sister state in which the tort occurred will be given effect in a suit in Maryland to recover damages for the tort. Subsequent to that holding the General Assembly of Maryland repealed and re-enacted § 4, Article 67 of the Maryland Code, with amendments to expand the measure of damages allowed in a wrongful death action,[6] but apparently did not see fit to amend § 4 or any other section in the Act to contradict or overrule the construction of the Act in *Debbis* enforcing the arbitrary ceiling in the amount of recovery in a case where the law of the place where the tort occurred imposes such a ceiling. The General Assembly is presumed to be aware of judicial interpretations of its enactments, and such a failure by it to act, particularly where it has considered the general subject matter, is at least indicative of a legislative acceptance of the *Debbis* rule. *Cf.*, Smolin v. First Fidelity Savings and Loan Ass'n, 238 Md. 386, 209 A.2d 546 (1965); Mahoney v. Board of Supervisors of Elections, 205 Md. 380, 109 A.2d 110 (1954). The action of the General Assembly subsequent to *Debbis* certainly does not show a Maryland public policy against the enforcement of arbitrary ceilings on the amount of recovery to be allowed in wrongful death actions brought in the factual context of *Debbis* or the instant case. The Maryland Court of Appeals has recently stated with approval that current legal thinking is that "* * * a public policy which will permit a state to refuse to enforce rights created by the law of a sister state must be very strong indeed." Texaco, Inc. v. Vanden Bosche, 242 Md. 334 at 340, 219 A.2d 80, 83 (1966). See also Harford Mutual Ins. Co. v. Bruchey, 248 Md. 669 at 674, 238 A.2d 115 (1968). There is no indication here of such a strong public policy in Maryland in favor of recovery of damages for wrongful death unlimited by arbitrary ceilings to overweigh the long established Maryland rule of *lex loci delicti*.

For the above reasons, this court is of the view that the statutory ceiling of $35,000 imposed by the Minnesota statute must be applied in this case.

### III

The defendants wish this court to strike paragraph 10 of plaintiff's Amended Complaint on the ground that no "privity" has been alleged between plaintiff's decedent, Uppgren, and Loving. In opposition to the motion plaintiff argues: "Pursuant to Maryland law, the choice of law rule in contract actions is the 'place of contracting.' This choice of law governs all matters bearing upon the extent of the contractual obligations, the execution, interpretation and validity of the contract in question [cases cited omitted] * * * The 'place of contracting' is the place where the last act necessary to complete the contract and give it validity were performed." Plaintiff continues her ar-

---

5. For example:
 a. Laws of Maryland, 1937, Chap. 495, allowing suit to be brought in Maryland for wrongful death occurring elsewhere irrespective of whether the state in which the wrongful death occurred had a wrongful death statute alike or similar in scope to that of Maryland.
 b. Laws of Maryland, 1949, Chap. 742, allowing a ship to be liable itself for its wrongful act under admiralty law resulting in death.
 c. Laws of Maryland, 1969, Chap. 352, greatly broadening the measure of damages for the wrongful death of a spouse or child to include damages for mental anguish, loss of society, and similar matters.

6. Laws of Maryland, 1969, Chap. 352.

gument by asserting that the last act necessary to complete the contract was the mailing of Interior's acceptance which took place in Washington, D. C., requiring, therefore, the application of the substantive law of the District of Columbia, which has eliminated the necessity of "privity." [7]

Defendants reply by stating that this court should apply Maryland conflict of law rules applicable to *contract* actions, but that the "last act necessary" was the receipt by Loving of the acceptance in Maryland, or in the alternative, that " * * * breach of an implied warranty of fitness and quality may also be interpreted as a matter arising in connection with the performance of the contract." Defendants claim College Park, Maryland, was the "place of performance" because of delivery there to Interior. Thus, defendants desire the application of Maryland substantive law, which requires "privity" under this factual situation.[8]

In an effort to apply the appropriate conflict of law rule, this court has searched but found no Maryland decision specifically dealing with the problem at hand. Both parties would have this court deal with the present problem by application of *contract*-conflict rules. In this the court believes both err.

In determining the appropriate choice of law rule to apply in the instant factual situation, it is appropriate to consider the nature and historical background of an action for personal or property injury based upon a breach of warranty. A leading work on products liability says:

"Underlying the requirement of privity is the erroneous idea that warranty is, and always has been, a contractual concept. Originally, warranty was an action tortious in nature. Rogers v. Toni Home Permanent Co. [167 Ohio St. 244, 147 N.E.2d 612 (1958)], fa-

mous in the field of express warranty by advertising, points out:

'A prevalent but mistaken notion is extant that the term, warranty, has always carried the implication of a contractual relationship. From a historical standpoint such notion is without foundation. Some of the cases, and well known and respected writers on legal subjects, point out that originally the consumer or user of an article, which was represented to be in good condition and fit for use and proved not to be, was accorded redress by an expansion of the action of trespass on the case to include deceit—a fraudulent misrepresentation—which sounds distinctly in tort. Undoubtedly, the recognition of such a right of action rested on the public policy of protecting an innocent buyer from harm rather than to assure any contractual rights * * *,'

and

'Other writers have no hesitancy in asserting that in the beginning an action on "breach of warranty" was a tort action to give relief for the breach of a duty assumed by the seller, and that the introduction at a much later date of the method of declaring on a warranty *"indebilitatus assumpsit* (an implied promise or obligation on the part of one to pay to another what in fairness and good conscience the former should pay) constituted the recognition of an additional or alternative remedy of a contractual aspect to secure relief where a breach of warranty is involved.' [147 N.E.2d at 614, 615]." [9]

"Writers [omitted footnote specifically refers to Prosser, Torts, § 84, 2d ed. 1955] and other [footnote omitted] cases, in addition to the *Rogers* case, have similarly pointed out the fallacy

7. Cottom v. McGuire Funeral Service, Inc., 262 A.2d 807 (D.C.App.1970); Picker X-Ray Corp. v. General Motors, 185 A.2d 919 (D.C.Mun.App.1962).

8. *Blankenship*, supra.

9. Frumer and Friedman, Products Liability, Volume 2 (1970), § 16.03[i], pp. 3–36 and 3–37.

in regarding warranty as historically a contractual concept." [10]

Prosser, in his work on torts, expresses similar views as follows:

" * * * The seller's warranty is a curious hybird of tort and contract, unique in the law. In its inception the liability was based on tort, and the action was on the case; [footnote omitted] and it was not until 1778 that the first decision [footnote omitted] was reported in which the plaintiff proceeded upon a contract theory. Thereafter the warranty gradually came to be regarded as a term of the contract of sale, express or implied, for which the normal remedy is a contract action. But the obligation is imposed upon the seller, not because he has assumed it voluntarily, but because the law attaches such consequences to his conduct irrespective of any agreement; [footnote omitted] and in many cases, at least, to hold that a warranty 'is a contract is to speak the language of pure fiction.' [footnote omitted]. Unlike other elements of a contract, warranty never has lost entirely its original tort character * * * Regardless of the form of action, the tort element has been recognized by a number of courts which have applied the tort rule as to survival of actions [footnote omitted] or the statute of limitations, [footnote omitted] or the more liberal tort rule as to damages [footnote omitted] or have allowed recovery for wrongful death [footnote omitted]." Prosser, Torts, 2d ed., § 83, pp. 493–94.

"* * * The preoccupation with contract in connection with warranty has no sound foundation. The action for breach of warranty was originally a tort action, for breach of a duty assumed, [footnote omitted] and it is by no means clear that it was anything more than accident that the cases which arose involved contracts which led to its being regarded as a matter

of contract at all * * * " Id., at § 84, p. 507.

The Maryland Court of Appeals has quoted the views of Prosser with approval relative to the origin of the action for breach of implied warranty and its close kinship to tort. In Twombley v. Fuller Brush Co., 221 Md. 476, 158 A.2d 110 (1960), the plaintiff brought suit for damages arising from hepatitis alleged to have been caused by his use of a spot remover manufactured and sold by Fuller Brush Co. One count of the declaration was based on breach of an implied warranty, the other on negligence. The Court of Appeals of Maryland, in specific reference to the two grounds of plaintiff's claim, stated at pp. 488–489, 158 A.2d at p. 116:

" * * * The close relationship between these two possible bases of liability in a case such as this is clearly brought out by Prosser, Torts (2d ed.), §§ 83, 84. * * *"

In Bryer v. Rath Packing Co., 221 Md. 105, at pp. 108–109, 156 A.2d 442, at p. 444 (1959), though an action based on negligence to recover for damage caused by a foreign substance in food, the following pertinent language was used by the Court of Appeals of Maryland:

" * * * The action for breach of warranty was originally a tort action for breach of duty assumed, and a number of decisions have considered the original tort theory very much alive. In the warranty cases the Courts have said the warranty is one of merchantable quality or fitness for the general purpose for which the goods are sold which, in the food cases, means reasonably fit and safe for human consumption. Prosser, Torts, Sec. 84, p. 507 (2d ed. 1955). * * *

"Because the question of fitness and safeness for human consumption is measurable by the same tests in both the warranty cases and the negligence cases in which negligence is proven or properly to be inferred,

10. Id., at pp. 3–37 and 3–38.

both classes of cases may be precedents of value in deciding the case before us."

■ Earlier Maryland cases discussing the requirement of privity in an implied or express warranty action indicate that privity is necessary, not because the cause of action is bottomed in contract, but because a direct contractual relationship was deemed to be required to create the warranty and the concomitant duty, the breach of which constituted a tort. State to Use of Bond v. Consolidated Gas, Electric Light and Power Company, 146 Md. 390, 396, 126 A. 105 (1924). The fact, therefore, that Maryland has, as a general rule, required privity of contract as a prerequisite to an action for breach of an implied or express warranty does not necessarily mean that its courts view such an action as possessing more of the indicia of contractual actions than of tort actions. It is believed by this court that the highest court of Maryland, if faced with the necessity to decide the question, would determine that an action based upon an implied warranty (arising from a contract or sale made prior, of course, to the July 1, 1969 effective date of the amendment to Article 95B, § 2–318, Anno. Code of Md.) bears such a close relationship to one based upon tort that it should be subject to the rule of *lex loci delicti* for the same reasons as is a tort action. See White v. King, *supra*.

Other states have reached a similar result. See Pittsburg, C. C. & S. L. Ry. Co. v. Grom, 142 Ky. 51, 133 S.W. 977 (1911); Goldberg v. American Airlines, 23 Misc.2d 215, 199 N.Y.S.2d 134 (1960); Humber v. Morton, 426 S.W.2d 554 (Tex.1968); see also Frumer and Friedman, *supra*, § 38.03, footnotes 4 and 5, pages 423–24; Prosser, *supra*, § 84, pages 493–94.

This view of Maryland law does not conflict with the opinions expressed in Keco Industries, Inc. v. ACF Industries, Inc., 316 F.2d 513 (4th Cir. 1963), that matters arising in connection with the performance of a contract are to be governed by the law of the place of performance. In that case the issue was strictly a contractual one arising out of the allegedly wrongful termination of a contract and had no connection at all with an action for breach of an implied warranty.

Applying the rule of *lex loci delicti* results, of course, in the application of Minnesota law as previously noted in this opinion. Minnesota courts have had the occasion to rule on the necessity of privity in actions for breach of implied warranty and have ruled that privity is not required. McCormack v. Hankscraft Co., 278 Minn. 322, 154 N.W.2d 488 (1967); Beck v. Spindler, 256 Minn. 543, 99 N.W.2d 670 (1959).

■ Although the result reached by the court does not make necessary a determination of whether the law of Maryland requires privity to maintain an action for breach of an implied warranty under the circumstances alleged in the complaint in this case, it might well be argued that, even if Maryland law applied on the question of privity, the motion of the defendants to strike paragraph 10 should fail. Maryland seems to have adopted the theory that privity is not required to maintain a suit against a manufacturer or seller for an injury sustained in the use of a chattel which is likely to be dangerous for the use for which it is supplied. Babylon v. Scruton, 215 Md. 299, 138 A.2d 375 (1958); Otis Elevator Co. v. Embert, 198 Md. 585 (1951); Kaplan v. Stein, 198 Md. 414, 84 A.2d 81 (1951); see also State to Use of Bond v. Consolidated Gas, Electric Light and Power Company, *supra*, 146 Md. 398–399, 126 A. 105 and Goldman & Freiman Bottling Co. v. Sindell, 140 Md. 488, 117 A. 866 (1922). The Restatement of Torts, § 388 has been cited approvingly by the Maryland Court of Appeals in Twombley v. Fuller Brush Co., *supra* and other cases. That section reads as follows:

"One who supplies directly or through a third person a chattel for another to use, is subject to liability

to those whom the supplier should expect to use. the chattel with the consent of the other or to be in the vicinity of its probable use, for bodily harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so."

Paragraph 10 of the plaintiff's complaint reads as follows:

"The crash of Helicopter N 700 and the death of Robert A. Uppgren were proximately caused by the wrongful acts of Defendants HUGHES, EXECUTIVE and LOVING, jointly and severally, by breaching an implied warranty of fitness and quality in the sale of Helicopter N 700 by Defendants to INTERIOR in a condition not fit for the purpose for which Helicopter N 700 was intended, namely, safe flight, in that a critical part, namely, a bumper plug (Hughes Part No. 269A5513) was designed and specified to be a floating element located between the engine shroud or fly wheel and the lower coupling drive shaft (Hughes Part No. 269A5504). Defendants knew, or with the exercise of reasonable care should have known, that said bumper plug would fall out, during engine change-over and if not replaced, would create a dangerous condition for users of its helicopters."

The allegations of paragraph 10 seem to satisfy all the requirements of liability specified in § 388 above of the *Restatement of Torts*. But, as heretofore stated, the court need not decide that issue since it has determined that the applicable choice of law rule results in the use of Minnesota law which does not require privity.

For the reasons stated, the motion of the defendants to reduce the ad damnum clause of paragraphs 12, 16, 21, and 25 of the Amended Complaint will be granted and the motion to strike paragraph 10 thereof will be denied. The court will sign an appropriate order in accord with this opinion upon presentation by counsel.